AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>THE CELLULAR TELEPHONE ASSIGNED CALL<br>NUMBER 937-422-3902 | )<br>)<br>) Case No. 3:20mj156<br>)<br>)<br>) |

FILED
RICHARD W. NAGEL
CLERK OF COURT

3/23/20

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST. DIV. DAYTON

## APPLICATION FOR A SEARCH WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A

located in the _____Southern_____ District of _____Ohio_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC s. 1952 | tampering with a victim, witness or informant |
| 18 USC s. 1953 | retaliating against a victim, witness or informant |

The application is based on these facts:
SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

☐ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Lance Kepple, SA of the FBI
*Printed name and title*

Sworn to before me and signed in my presence via facetime.

Date: __03/23/2020__

City and state: Dayton, Ohio

*Judge's signature*

Sharon L. Ovington, US Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Lance R. Kepple, being duly sworn, depose and state the following:

## INTRODUCTION

1. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI), and have been so employed since 1999. I am currently assigned to the Dayton, Ohio Resident Agency of the Cincinnati Field Office. In connection with my official duties, I investigate violations of federal criminal laws, including offenses pertaining to public corruption, illegal drugs, violent crime, and other violations of federal and state laws. I have received training in the above listed crimes and specifically have training in the analysis of historical cellular telephone records.

2. Along with other agents, officers, and investigators of the FBI, I am currently involved in an investigation of public corruption and other crimes in the Dayton, Ohio area:

3. Information associated with the cellular telephone assigned call numbers 937-671-1995 and 937-422-3902 (hereinafter referred to as the "**TARGET CELLPHONES**") that are stored at premises controlled by AT&T, a wireless telephone service provider headquartered at 11760 US Highway 1, North Palm Beach, Florida, 33408. The **TARGET CELLPHONES** are also described in Attachment A hereto.

4. The purpose of the Application is to seize evidence of violations of the following:

    a. 18 U.S.C. § 1512 Tampering with a witness, victim, or an informant; and

    b. 18 U.S.C. § 1513 Retaliating against a witness, victim, or an informant.

5. The items to be searched for and seized are described more particularly in Attachment B hereto and are incorporated by reference.

6. As part of the investigation, I have reviewed documentation and reports provided by and discussed information with other agents, officers, and investigators involved in the investigation. For purposes of this Affidavit, I have not distinguished between information of which I have direct knowledge and that of which I have hearsay knowledge.

7. This Affidavit does not contain every fact known to the investigation, but only those deemed necessary to demonstrate sufficient probable cause to support the search of the above noted account (as described in Attachment A).

8. As a result of the investigation described more fully below, there is probable cause to believe that evidence of a crime; contraband, fruits of crime, or other items illegally

1

possessed; property designed for use, intended for use, or used in committing a crime of violations of federal law, 18 U.S.C. § 1512 Tampering with a witness, victim, or an informant; and 18 U.S.C. § 1513 Retaliating against a witness, victim, or an informant. (as described in Attachment A).

## JURISDICTION

9. This court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PERTINENT FEDERAL CRIMINAL STATUTES

10. 18 U.S.C. § 1512 (Tampering with a witness, victim, or an informant)(d) states, "Whoever intentionally harasses another person and thereby hinders, delays, prevents, or dissuades any person from—
    (1) attending or testifying in an official proceeding;
    (2) reporting to a law enforcement officer or judge of the United States the commission or possible commission of a Federal offense or a violation of conditions of probation 1 supervised release,,1 parole, or release pending judicial proceedings;
    (3) arresting or seeking the arrest of another person in connection with a Federal offense; or
    (4) causing a criminal prosecution, or a parole or probation revocation proceeding, to be sought or instituted, or assisting in such prosecution or proceeding"

11. 18 U.S.C. § 1513(b) (Retaliating against a witness, victim, or an informant) states, "Whoever knowingly engages in any conduct and thereby causes bodily injury to another person or damages the tangible property of another person, or threatens to do so, with intent to retaliate against any person for—
    (1) the attendance of a witness or party at an official proceeding, or any testimony given or any record, document, or other object produced by a witness in an official proceeding; or
    (2) any information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings given by a person to a law enforcement officer"

2

## BACKGROUND INFORMATION

12. During approximately 2019, the Federal Bureau of Investigation and the United Sates Attorney's Office for the Southern District of Ohio unsealed multiple indictments relating to in investigation into public corruption and other crimes in the Dayton Ohio area known as "Demolished Integrity". With each unsealing, the described investigation received significant coverage on the local and regional news platforms including, but not limited to, television, radio, newspapers, and internet sites. A significant number of those reports could be described as "investigative reports". Contained within a number those reports were names of individuals and businesses, believed by the reporters, to be associated with the investigation, the indicted parties, or possibly having cooperated with law enforcement.

13. Multiple news reports identified one of the purportedly cooperating individuals as a person identified herein by the initials "M.M." He was listed as one of the owners of a business associated with the Demolished Integrity investigation. The news reports suggested that M.M. had cooperated with Law Enforcement. In particular, a March 1, 2020 Dayton Daily News article stated that M.M., "co-owner and operating manager [of a certain business], is the confidential FBI informant who recorded Williams and another of the indicted defendants, Dayton businessman Brian Higgins." Law Enforcement, in general, and the Federal Bureau of Investigation, specifically, has not made a statement regarding M.M.

14. Brian Higgins was one of the indicted and arrested persons in connection with the Demolished Integrity investigation. Specifically, charged with wire fraud stemming from an alleged fraudulent insurance claim on a property located in Dayton, Ohio, Higgins was arrested on those offenses in late April 2019. It should be noted that the allegations in the indictment stemmed from an insurance claim filed in late 2014 – almost six years ago.

15. Ledra Boyd was not indicted during the course of the investigation. However, she was well known to law enforcement. Boyd was a close associate of Higgins and was observed to act on behalf of Higgins during the scheme to file the fraudulent insurance claim. Boyd was observed to drive vehicles registered to Higgins. During the course of the investigation, Boyd would often appear in database searches associated with addresses, not including the Meeker Creek residence, owned or controlled by Higgins. Boyd was known to use the nickname "Red".

## FACTS SUPPORTING PROBABLE CAUSE

16. Following the arrest of Higgins and during the normal legal process, Higgins was provided the required discovery. That discovery included numerous consensual recordings with more than one FBI source. On at least one occasion following his arrest, Brian Higgins and his attorney met with Law Enforcement. During that conversation, Higgins made several statements indication that M.M. had cooperated with Law Enforcement and was responsible for Higgins being arrested.

17. On or about March 3, 2020 at approximately 1:00 pm, an employee of M.M., identified herein as "WS", was parked in front of Marshall's residence in Montgomery County, Ohio. While parked there, WS observed a black female driving a sedan, which WS described as cream-colored, slowly pass the residence with something in her hand. WS presumed the driver was lost given her slow rate of travel and the fact that she appeared to be holding a phone as if looking at a map. The black female turned around in the cul de sac, drove past WS again and departed Yeoman Court. A short time later, the same vehicle driven by the same female turned back into Yeoman Court and drove slowly past the residence again. WS paid close attention to the driver and vehicle since this was its second trip down a short cul de sac in a matter of minutes. WS reported observing the driver filming 608 Yeoman Court on her cell phone. WS attempted to confront the driver after she had turned around in the cul de sac, but the driver drove off quickly. WS followed the vehicle and was able to photograph the vehicle from behind. WS never lost sight of the vehicle prior to taking the photograph. WAS also described distinctive damage to the rear of the vehicle, which made it easy to identify the vehicle. The license of the vehicle was clear in the photograph – namely, Ohio HRG1068.

18. WS advised M.M. of the incident via telephone. M.M. was able to catch up to the vehicle and spoke briefly to the driver. M.M. asked why she was filming his residence. The female denied filming his residence. Initially, M.M. did not recognize the female driver. Approximately a few days later, Marshall recalled having spoken to the driver before and identifier her as Higgins' associate known as "Red".

19. A records check for Ohio license plate HRG1068 determined the registered owner of the vehicle is Brian Higgins.

20. On March 6, 2020, the Dayton Daily News posted an article with the headline, "Businessman wrapped up in Dayton corruption probe sues government informant". Accompanying the article is a photograph of a smiling Higgins that appears to be outside the Montgomery County Court House in Dayton, Ohio. In the photograph, Higgins appears to be wearing a blue fleece coat and the sky appears to be overcast. An internet

4

search for the weather in Dayton Ohio on that date shows a day time high temperature of 39 degrees Fahrenheit and overcast. The article states, "a man facing federal insurance fraud charges stemming from a local public corruption probe is suing the government's informant in the case, saying the informant was the one responsible for pocketing insurance money..." and "...A Dayton Daily News investigation found, based on records and interviews, that [M.M.] is a government informant in the investigation and United Demolition was involved in the cases of Williams and Higgins. [M.M.] denied he is the informant."

21. A review of filings in the Montgomery County Court of Common Pleas confirm that Higgins filed a civil lawsuit for purported breach of contract against M.M on or about March 6, 2020. The civil complaint alleges that the cause of action arose from the same 2014 insurance claim underlying the federal criminal fraud charges against Higgins. In it, Higgins seeks monetary damages from M.M.

22. Based on my training and experience as well as the timing of these events, I believe that Higgins and his associate, Boyd, are attempting to harass and damage the tangible property of M.M. in retaliation for his willingness to assist federal authorities against Higgins. Notably, the events giving rise to Higgins' civil action occurred during late 2014. He was arrested in this federal matter arising from the alleged fraudulent claim during April 2019 and soon after received discovery revealing M.M. as a witness against him. Higgins trial has been set for July 2020. During early March 2020, local media opined that M.M. may have worked as an informant. It was only after this chain of events that Higgins in March 2020 filed a civil action against M.M., seeking damages for events that occurred in late 2014. The timing of these events strongly indicate that Higgins filed the suit to retaliate against M.M. or to deter him from testifying at his July 2020 trial. Additionally, Boyd's efforts to surveil M.M.'s home constitutes harassing behavior likely linked to M.M.'s role as a potential witness in the case against Higgins.

23. A data base search was conducted for telephone numbers associated with Higgins. Cellular telephone number 937-671-1995 has multiple listings associated with Higgins and his known business interests. 937-671-1995 has a provider listing of Cingular Wireless. Your affiant is aware that Cingular Wireless is operated and owned by AT&T.

24. A data base search was conducted for telephone numbers associated with Boyd. Cellular telephone number 937-422-3902 has multiple listings associated with Boyd, Higgins and/or his known business interests. 937-422-3902 has a provider listing of Cingular Wireless. Your affiant is aware that Cingular Wireless is operated and owned by AT&T.

25. In my training and experience, I have learned that AT&T Wireless is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which

5

they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

26. Based on my training and experience, I know that AT&T Wireless can collect cell-site data on a prospective basis about the TARGET CELLPHONES. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as AT&T Wireless typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

27. Based on my training and experience I know that AT&T Wirless has additional reports that further identify the location of cellular telephones. Specifically, AT&T Wireless maintains a report called Network Event Location System, NELOS.

28. Also based on my training and experience, I know that subscriber information and billing records maintained by telephone providers provide material evidence of criminal offenses. Such information is significant in that it helps in determining the identities of the users of the telephones.

29. Based on my training and experience, I know that historical cell phone records can be used to determine the approximate location of cellular telephones. In addition, I know that persons involved in illegal activity as part of a conspiracy often communicate with each other in furtherance of their illegal activity. Records of that communication is maintained in historical cell phone records.

30. Based on the information detailed above, I submit that there is probable cause to believe that the information stored by AT&T for the TARGET CELLPHONES contains evidence of the criminal violations identified above.

6

## ELECTRONIC COMMUNICATIONS PRIVACY ACT

31. I anticipate executing the requested warrant for the listed account under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require AT&T to disclose to the government copies of the records and other information (including the contents of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

32. Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence of a crime; contraband, fruits of crime, or other items illegally possessed; property designed for use, intended for use, or used in committing a crime of violations of federal law, may be located in the account described in Attachment A, including the following offenses: 18 U.S.C. § 1512 Tampering with a witness, victim, or an informant; and 18 U.S.C. § 1513 Retaliating against a witness, victim, or an informant

33. I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment B.

34. Because the warrant for the account described in Attachment A will be served on AT&T, who will then compile the requested records at times convenient to that entity, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Special Agent Lance R Kepple
Federal Bureau of Investigation


SUBSCRIBED and SWORN
before me this _____ March, 2020
       23rd

UNITED STATES MAGISTRATE JUDGE

7

## ATTACHMENT A

### Property to Be Searched

This warrant applies to records and information associated with the cellular telephone assigned call number 937-422-3902 ("the Account") that are stored at premises controlled by AT&T ("the Provider"), a wireless telephone provider headquartered at 11760 US Highway 1, North Palm Beach, Florida, 33408.

8

## ATTACHMENT B

### Particular Things to be Seized

I. **Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time period of February 1, 2020 to present:

    a. The following information about the customers or subscribers of the Account:

        i. Names (including subscriber names, user names, and screen names);

        ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

        iii. Local and long distance telephone connection records;

        iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

        v. Length of service (including start date) and types of service utilized;

        vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

        vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

        viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

    b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account (for ALL VOICE, SMS AND DATA ACTIVITY), including:

        i. The date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

        ii. Information regarding the cell towers and sectors through which the communications were sent and received and any available Nelos data for the communications.

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of 18 U.S.C. §1512 (Tampering with a witness) and §1513 (Retaliating against a witness) and other crimes during the period of February 1, 2020 to present, including above-described items that place the user of the telephone in the vicinity of the home of potential government witnesses in the trial of Brian Higgins.